**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

KATIE KLAUS and TAYLOR SURH, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

JRSK, INC., d/b/a AWAY

Defendant.

Case No. 3:25-cv-10385-JSC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs Katie Klaus and Taylor Surh (collectively "Plaintiffs") bring this action on behalf of themselves and all others similarly situated (the "Class Members") against JRSK, Inc. d/b/a Away ("Defendant" or "Away"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.awaytravel.com (the "Website") and whose electronic communications were intercepted or recorded by advertising technology provided by Criteo Corp. ("Criteo"), Meta Platforms, Inc. ("Facebook" or "Meta"), and Google, LLC ("Google") (collectively "Third Parties").

2. Away "is a modern lifestyle brand creating thoughtful products designed to transform travel" that is "one of the fastest growing consumer brands in the world."[1] Defendant offers various lines of travel-related products including luggage, bags, and accessories. When consumers enter the Website, Defendant warrants that the targeting cookies it utilizes for advertising purposes "do not store directly personal information."[2]

3. Despite its promises and representations of privacy, Defendant aids, agrees with, employs, or otherwise enables Third Parties to eavesdrop on communications sent and received by Plaintiffs and Class Members on the Website that Defendant owns and operates, including communications that contain personally identifiable information ("PII"). By failing to procure consent before enabling the Third Parties to intercept these communications, Defendant violated the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq.*), the California Invasion of Privacy Act ("CIPA") § 631, CIPA § 632, CIPA § 638.51(a), and the California Constitution.

---

[1] LINKEDIN, AWAY, https://www.linkedin.com/company/away/.

[2] AWAY, TARGETING COOKIES, https://www.awaytravel.com/pages/terms.

## PARTIES

***Plaintiffs***

4. Plaintiff Katie Klaus is a resident and citizen of San Francisco, California.

5. At all relevant times, Plaintiff Klaus maintained active accounts with Facebook and Google. When creating her Facebook and Google accounts, Plaintiff Klaus provided Facebook and Google with her personally identifiable information ("PII"), including her full name, date of birth, phone number, and email address. Plaintiff Klaus used the same device to access the Website that she did to access her Facebook and Google accounts. Plaintiff Klaus was in California when she visited the Website.

6. In or around June 2025, Plaintiff Klaus accessed the Away Website—while in California—and purchased a Kids Carry-On suitcase. Despite Defendant's representations of confidentiality, Plaintiff Klaus's communications during this visit were intercepted and disclosed to the Third Parties through the tracking technologies embedded on the Website by Defendant. Such interceptions included communications that contained Plaintiff Klaus's PII and information about her Website purchases. Neither Defendant nor the Third Parties procured Plaintiff Klaus's consent prior to these interceptions, nor was Plaintiff Klaus on notice of the fact that such interceptions were occurring.

7. Plaintiff Taylor Surh is a resident and citizen of Oakland, California.

8. At all relevant times, Plaintiff Surh maintained active accounts with Facebook and Google. When creating his Facebook and Google accounts, Plaintiff Surh provided Facebook and Google with his PII, including his full name, date of birth, phone number, and email address. Plaintiff Surh used the same device to access the Website that he did to access his Facebook and Google accounts. Plaintiff Surh was in California when he visited the Website.

9. In or around November 2024, Plaintiff Surh accessed the Away Website—while in California—and purchased a Penn State University Collegiate Bigger Carry-On suitcase. Despite Defendant's representations of confidentiality, Plaintiff Surh's communications during this visit were intercepted and disclosed to the Third Parties through the tracking technologies embedded on the Website by Defendant. Such interceptions included communications that contained Plaintiff

Surh's PII and information about his Website purchases. Neither Defendant nor the Third Parties procured Plaintiff Surh's consent prior to these interceptions, nor was Plaintiff Suhr on notice of the fact that such interceptions were occurring.

***Defendant***

10. Defendant JRSK, Inc. is a Delaware corporation with its headquarters located in New York, New York. Defendant owns and operates the Website. Defendant knowingly and intentionally incorporated a host of tracking technology for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including tracking technologies provided by Third Parties.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiffs allege that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

12. This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this District by offering its products to residents of this District and performing services in this District, including the operation of two brick-and-mortar locations in this District. Further, Plaintiffs were residing in this District when they accessed the Website and had the Tracking Technologies installed on their devices, which Defendant knew would cause harm within California.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant does substantial business in this District, a substantial part of the events giving rise to the claim occurred in this District, and Plaintiffs reside in this District.

//

//

## FACTUAL ALLEGATIONS

### A. Defendant's Website and Privacy Representations

14. Defendant owns and operates the Website. Unbeknownst to users, Defendant integrates tracking codes from Google, Meta, and Criteo into the Website (collectively the "Tracking Technologies").

15. "[W]ebsite owners often manipulate their privacy settings to make it harder for consumers to protect their privacy."[3]

16. "Cookies allow the websites to track user information for profiling and targeted advertising. The cookie consent notices will typically ask for consent to data collection and state how the data will be used. In this decision-making setting, users often have incomplete information regarding the cookie settings, which puts them at a disadvantage when compared with web designers."[4]

17. Through its Website, Defendant promises consumers that it will keep their personally identifiable electronic communications confidential. When customers first access the Website, Defendant presents them with a prominent banner that reads: "This website uses cookies to ensure you get the best experience." *See* Figure 1.




**Figure 1**

---

[3] Danyang Li, *The FTC and the CPRA's Regulation of Dark Patterns in Cookie Consent Notices*, 1 U. CHI. BUS. L. REV. 561 (2022) https://businesslawreview.uchicago.edu/print-archive/ftc-and-cpras-regulation-dark-patterns-cookie-consent-notices; Midas Nouwens et al., Dark Patterns After the GDPR: Scraping Consent Pop-Ups and Demonstrating Their Influence, PROC. 2020 CHI CONF. ON HUM. FACTORS COMPUTING SYS. 1–13 (2020).

[4] *Id.*

18. Defendant explains that "[t]argeting cookies are small, encrypted files that track users' actions and are used to identify users between different websites. Targeting cookies collect user information and use it to build a profile of users' interests and then show personalized ads for that specific user. Targeting cookies help to attract customers with targeted ads. The information the cookies gather about you can be shared with other advertisers to measure the performance of their advertisements."[5]

19. As shown below, Defendant explicitly warrants that targeting cookies "do not store directly personal information . . . ." *See* Figure 2. In fact, the *only* targeting cookie Defendant claims to have installed is an Optimizely cookie offered by Shopify. *See* Figure 3. That is false as discussed *infra–Sections* E–J, as Defendant utilizes many tracking technologies to effectuate its targeted advertising.




**Figure 2**




**Figure 3**

[5] COOKIESCRIPT, *What are Targeting Cookies?* https://cookie-script.com/knowledge-base/kb-targeting-cookies.

20. As courts across the country have recognized, the identifiers that the Tracking Technologies capture—email address, phone number, and social media IDs—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

21. Despite promising to keep Plaintiffs and consumers PII confidential, Defendant systematically discloses such information with Third Parties.

### B. Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy

22. "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[6]

23. "The value of consumer data often comes from identifying users and combining their data from various sources. This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data. The ability to identify users enables website and app operators to combine data and track user activity across devices."[7]

24. "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user. Advertisers might expect more precise targeting to increase sales. Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad." [8]

25. For retailers—like Defendant—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[9]

---

[6] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[7] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[8] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[9] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

26. With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their privacy"[10]
- "67% of respondents don't understand what data privacy means or how their data is being used"[11]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[12]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [13]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[14]
- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [15]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[16]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[17]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what

[10] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[11] *Id.*

[12] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[13] *Id.*

[14] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[15] *Id.*

[16] *Id.*

[17] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

actions they can take (25%), and think hackers can access their data no matter what they do (21%).[18]

27. This concern over data privacy also impacts consumer purchase behavior:

- 79% of Americans are concerned about how companies use their data.[19]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [20]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[21]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[22]
- 48% of users have stopped buying from a company over privacy concerns.[23]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[24]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[25]

---

[18] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

[19] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[20] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[21] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[22] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[23] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[24] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[25] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

28. Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

### C. The Federal Trade Commission and California Legislature's Protection of Consumer Data

29. The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information, but didn't live up to their promises in the day-to-day operation of their business."[26]

30. Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[27]

31. At the state level, the California Legislature is at the forefront of protecting citizens privacy. Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]iscose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[28] This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that

---

[26] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[27] *Privacy and Security* Enforcement, FEDERAL TRADE COMMISSION, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[28] Cal. Bus. & Prof. Code § 22575(a).

permits the physical or online contacting of a specific individual."[29]

**D. Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

32. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

33. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

34. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

35. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";

---

[29] Cal. Bus. & Prof. Code § 22575(a).

> (ii) "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use . . . any information so obtained."

36. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

37. CIPA also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c).

38. Also relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

39. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

40. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

41. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

42. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace

devices" to record the numbers of incoming calls to that telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices to Internet tracking technology.

43. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is incoming information that is being sent to that same user.

44. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.,* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). Thus, courts have found that internet tracking technology like those here fall under the purview of CIPA § 638.51. *See, e.g., Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC,* 2024 WL 5102709, at *3–4 (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40–42 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc*., 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51"); *Greenley v. Kochava, Inc.,* 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications").

45. This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc,*. 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

46. Individuals may bring an action against a violator of CIPA § 631, 632, and 638.51 for $5,000 per violation. Cal. Penal Code § 637.3.

47. In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[30]

48. Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[31]

**E. Function of the Tracking Technologies**

49. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

50. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

51. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

---

[30] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[31] 18 U.S.C. § 2511(d)

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

52. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

53. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

54. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Google Analytics and DoubleClick tracking technology, the Meta Pixel, and the Criteo One Tag embedded on the Website by Defendant constitute Source Code.

55. For example, to make Defendant's Websites load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Websites' data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 4, which explains how Defendant's Websites transmit instructions back to users' browsers in response to HTTP requests.




**Figure 4**

### F. Google's Tracking Technologies

56. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

57. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

58. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

59. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

60. Google continued updating its analytics platform, launching Universal Analytics in

2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

61. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

62. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

63. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."

64. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website. The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

65. In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

66. Thus, Defendant is essentially handing its users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendant and transmits those communications to Google.

67. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google database and cannot be changed.

68. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (*e.g.*, information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (*e.g.*, measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (*e.g.*, classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

69. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

70. The Website utilizes Google's pixel and SDK. As a result, Google intercepted users' interactions on the Website, including their PII. Google received at least "Custom Events" and URLs that disclosed the products purchased by the user. Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs by matching IP addresses, device information, and User-IDs it intercepts and linking such information to an individual's specific identity.

71. For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

72. Similarly, Google also utilizes the "auid" or "Advertiser User ID," and "guid" or

"Globally Unique Identifier," cookies which identify unique users and unique interactions with a website Defendant sent these identifiers with each consumer's "event" data.

73. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

74. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

75. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."

76. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques. Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

77. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.

78. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

79. As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

80. Due to the vast network of consumer information held by Google, matches the IP addresses, device information, User-IDs, and partial phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

81. Google then utilizes such information for its own purposes, such as targeted advertising.

82. Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[32] Such practices were in effect on the Website for targeted advertising purposes.

83. Plaintiffs did not consent to the interception or disclosure of their data to Google. Defendant's disclosure, and Google's interception, of Plaintiffs' and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, CIPA § 636.51(a), and the California State Constitution.

**G. Meta's Tracking Technology**

84. Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, bringing in a grand total of $114.93 billion in 2021.

85. Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads."

86. Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 2.9 billion active users.

87. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"

88. Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:

[32] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

**Table 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

89. One of Meta's most powerful advertising tools is Meta Pixel, formerly known as Facebook Pixel, which launched in 2015 and its SDK.

90. Meta touted Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."

91. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

92. Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

93. This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

94. For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

95. The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

96. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

97. A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

98. The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

99. The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

100. A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

101. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

102. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

103. Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

104. Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.

105. Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.

106. At the time Plaintiffs used Defendant's Website, they maintained active social media accounts on Facebook. Plaintiffs accessed the Defendant's Website from the same device they used to visit Facebook, and Meta associated the data it collected about them from Defendant's Website with their Facebook account and other PII.

107. Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.

108. Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app."

109. Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match

members of the audiences' criteria.

110. In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

111. Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

112. According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"

113. In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

114. Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question.

115. Defendant uses at least the Meta Pixel on its Website. As a result, Defendant disclosed and Meta intercepted users'—including Plaintiffs'—interactions on the Website. Meta received at least the item URL, the product name, and checkout events. Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

116. Plaintiffs provided their PII to Defendant pursuant to their purchase from the Website. In doing so, this information was disclosed to and intercepted by Meta.

117. Plaintiffs did not consent to the interception or disclosure of their data to Meta. Defendant's disclosure, and Meta's interception, of Plaintiffs' and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, CIPA § 636.51(a), and the California State Constitution.

**H. Criteo's Tracking Technology**

118. Criteo is a digital advertising company that focuses on serving personalized advertisements. In 2021, Criteo earned $2.2 billion in revenue.

119. Criteo offers data collection and advertising technology to other companies. For instance, Criteo offers the "Criteo One Tag" which is a snippet of code similar to the Meta Pixel.

120. Using the Criteo One Tag, or by uploading data separately, companies like Away can utilize Criteo's advertising platform to target specific users. For instance, Criteo offers "audiences" that group users based on a specific data point or similarity between them.

121. Defendant uses Criteo's tracking technology, such as an SDK or pixel, on the Website. As a result, Defendant disclosed and Criteo intercepted users' interactions on Defendant's Website. Criteo received at least users' personally identifiable information, despite Defendant's representations to the contrary.

122. Criteo's tracking technology, when enabled, also receives fbp values from Meta to track different webpages.

123. Plaintiffs provided their PII and other sensitive data to Defendant as a part of their purchases. This information was disclosed to and intercepted by Criteo.

124. Plaintiffs did not consent to the interception or disclosure of their data to Criteo. Defendant's disclosure, and Criteo's interception, of Plaintiffs' PII, which Defendant promised would remain anonymized, without their consent is an invasion of privacy and violates several laws, including the ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, CIPA § 636.51(a), and the California State Constitution.

**I. Defendant's Use of Tracking Technologies**

125. Pursuant to agreements with Third Parties (Google, Meta, and Criteo) Defendant

intentionally and voluntarily embedded the Tracking Technologies on the Website. As illustrated within this section, Defendant unlawfully disclosed personally identifiable information to Third Parties through Tracking Technologies, without customers' consent.

126. The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

127. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

128. Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the user's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Google, Meta, Criteo, or other third parties.

129. Third parties—including Google and Meta—place cookies in web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII).

130. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

131. Defendant installs these Tracking Technologies despite its understanding that its customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties. This installation contradicts Defendant's promise to keep PII confidential. *See supra*–Figs. 2–3.

132. Contrary to its promise, as soon as consumers enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third Parties.

133. When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the checkout process. The URLs and page titles disclose what type of product the user is seeking to purchase. For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the product is shared, is shared with Third Parties as enabled by Defendant. The Third Parties also receive information when the consumer adds the product to their cart before checkout. *See e.g.* Figure 5, Figure 6.




**Figure 5**




**Figure 6**

134. Defendant also discloses confidential details about the purchase and personal information about the user to Third Parties in various forms throughout the checkout process.

135. Take, for example, Google's tracking technologies. On the checkout page, Plaintiffs and other users of Defendant's Website are prompted to enter their email address, phone number, name, and address. When a user completes the checkout process, Google receives the user's email, name, phone number, and address.[33] The purchaser's email, name, phone number, and street are sent and received in a hashed format, whereas the address (excluding the street) is received as plain text. Google associates all this information with its unique identifier, the auid. *See, e.g.,* Figure 7.




**Figure 7**

//

//

//

//

//

//

//

//

[33] Although Google drops the user's house number, it keeps the street name, city, postal code, state, and country.

136. Like Google, Meta has tracking technology on the website throughout the checkout process, including the sb, datr, dpr, c_user, xs, and fr cookies.

137. For instance, when a user selects the checkout button, Meta receives a button click in the form of a checkout value, which it associates with a user's fbp, cookies, and other unique identifiers. Figure 8.


```
id	1552702301726212
ev	SubscribedButtonClick
dl	https://www.awaytravel.com/cart
rl	https://www.awaytravel.com/products/featherlight-tote-jet-black?modals=cart-drawer-dialog
if	false
ts	1756821289258
cd[buttonFeatures]	{"classList":"btn w-full [.loading_&:disabled]:border-t-brand-primary [.loading_&:disabled]:bg-t-brand-primary","destination":"","id":"checkout","imageUrl":"","innerText":"CHECK OUT","numChildButtons":0,"tag":"button","type":"submit","name":"checkout","value":""}
cd[buttonText] CHECK OUT
cd[formFeatures]	[]
cd[pageFeatures]	{"title":"Your Shopping Cart"}
sw	3072
sh	1728
cud[external_id]	*#######-*#**-##*#-#***-##**####*##*
ncud[external_id]	*#######-*#**-##*#-#***-##**####*##*
ud[external_id]
	353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
aud[external_id]
	353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
v	2.9.227
r	stable
ec	1
o	14366
fbp	fb.1.1756820684476.6642160083
ler	empty
cdl	API_unavailable
plt	1096.1999998092651
it	1756821286793
coo	false
es	automatic
tm	3
expv2[]pl1
expv2[]el1
expv2[]bc1
rqm	FGET
```

```
sb	_rqLaPZort5KEv5CqwzbwveY
datr	_rqLaAE2EkxmUnyJunQmCVkj
dpr	1.25
c_user 100094052384262
xs	24%3ASI4iS7WeOSQAVg%3A2%3A1756820170%3A-1%3A-1
fr
	0tiXocf3YKYeqWuNM.AWdwCMOOkEctcyIDWfJdUrvVrwD7x1n8B8tlXvLmK4Nn44f__R0.Boi7r-..AAA.0.0.BotvLO.AWdhbLMLsyy1wPXVkR6X9Ara6zs
ar_debug	1
```


**Figure 8:** Data Sent to Meta (Black Border) and Active Meta Cookies (Red Border Overlay)

138. Meta also receives events, including an "initiate checkout" event (Figure 9) and an "add payment event" (Figure 10). These events are associated with an individual's PII by linking the events with the user's Facebook ID and other tracking cookies.

```
id      1552702301726212
ev      InitiateCheckout
dl      https://www.awaytravel.com/web-
pixels@2ddfe27cwacf934f7p7355b34emf9a1fd4c/custom/web-pixel-
46760120@1/sandbox/modern/checkouts/cn/hWN2Vsb7LuxAK7pZkXqs7etk?auto_redirect=fals
e&edge_redirect=true&locale=en-US&skip_shop_pay=true
rl      https://www.awaytravel.com/
if      true
ts      1756821296468
cd[contents]    [{"id":"100788BLKV1Standard","name":"Featherlight Tote in Jet
Black","content_category":"Bags","item_price":"98.00","quantity":"1"}]
cd[content_ids]         ["100788BLKV1Standard"]
cd[content_type]        product_group
cd[content_name]        Featherlight Tote in Jet Black
cd[content_category]    Bags
cd[currency]    USD
cd[value]       98.00
sw      3072
sh      1728
cud[external_id]        *#######-*#**-##*#-#***-##**####*##*
ncud[external_id]       *#######-*#**-##*#-#***-##**####*##*
ud[external_id]
        353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
aud[external_id]
        353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
v       2.9.227
r       stable
ec      2
o       12318
fbp     fb.1.1756820684476.6642160083
ler     empty
cdl     API_unavailable
plt     641.7999999523163
it      1756821295286
coo     false
eid     dl_begin_checkout_0a8acc77d2ff58ac65ab5590be350880
tm      1
expv2[]pl1
expv2[]el1
expv2[]bc1
rqm     GET
```

```
sb      _rqLaPZort5KEv5CqwzbwveY
datr    _rqLaAE2EkxmUnyJunQmCVkj
dpr     1.25
c_user 100094052384262
xs      24%3ASI4iS7WeOSQAVg%3A2%3A1756820170%3A-1%3A-1
fr
        0tiXocf3YKYeqWuNM.AWdwCMOOkEctcyIDWfJdUrvVrwD7x1n8B8tlXvLmK4Nn44f__R
0.Boi7r-..AAA.0.0.BotvLO.AWdhbLMLsyy1wPXVkR6X9Ara6zs
ar_debug        1
```


**Figure 9:** Data Sent to Meta (Black Border) and Active Meta Cookies (Red Border Overlay)


```
id      1552702301726212
ev      AddPaymentInfo
dl      https://www.awaytravel.com/web-
pixels@2ddfe27cwacf934f7p7355b34emf9a1fd4c/custom/web-pixel-
46760120@1/sandbox/modern/checkouts/cn/hWN2Vsb7LuxAK7pZkXqs7etk?auto_redirect=fals
e&edge_redirect=true&locale=en-US&skip_shop_pay=true
rl      https://www.awaytravel.com/
if      true
ts      1756821385408
cd[contents]    [{"id":"100788BLKV1Standard","name":"Featherlight Tote in Jet
Black","content_category":"Bags","item_price":"98.00","quantity":"1"}]
cd[content_ids]         ["100788BLKV1Standard"]
cd[content_type]        product_group
cd[content_name]        Featherlight Tote in Jet Black
cd[content_category]    Bags
cd[currency]    USD
cd[value]       98.00
sw      3072
sh      1728
cud[external_id]        *#######-*#**-##*#-#***-##**####*##*
ncud[external_id]       *#######-*#**-##*#-#***-##**####*##*
ud[external_id]
        353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
aud[external_id]
        353110dbfd074c31de019653958219c49395f3d39287d206ad40f5bb8db60deb
v       2.9.227
r       stable
ec      4
o       12318
fbp     fb.1.1756820684476.6642160083
ler     empty
cdl     API_unavailable
plt     641.7999999523163
it      1756821295286
coo     false
eid     dl_add_payment_info_0a8acc77d2ff58ac65ab5590be350880
tm      1
expv2[]pl1
expv2[]el0
expv2[]bc1
rqm     GET
```

```
sb      _rqLaPZort5KEv5CqwzbwveY
datr    _rqLaAE2EkxmUnyJunQmCVkj
dpr     1.25
c_user 100094052384262
xs      24%3ASI4iS7WeOSQAVg%3A2%3A1756820170%3A-1%3A-1
fr
        0tiXocf3YKYeqWuNM.AWdwCMOOkEctcyIDWfJdUrvVrwD7x1n8B8tlXvLmK4Nn44f__R
0.Boi7r-..AAA.0.0.BotvLO.AWdhbLMLsyy1wPXVkR6X9Ara6zs
ar_debug        1
```


**Figure 10:** Data Sent to Meta (Black Border) and Active Meta Cookies (Red Border Overlay)

139. Despite not being linked with an outside ID, Criteo also receives PII from Defendant without user consent. For example, pursuant to a "payment_info_submitted" event, Defendant discloses the product being purchased, the cost, the SKU, the user's hashed email address, and Meta's fbp parameter (which tracks Facebook users across different webpages) to Criteo. *See* Figure 11–13.


```
        "price": {
                "amount": 98,
                "currencyCode": "USD"
        },
        "product": {
                "id": "10022797508792",
                "title": "Featherlight Tote in Jet Black",
                "vendor": "Away Travel",
                "type": "Bags",
                "untranslatedTitle": "Featherlight Tote in Jet Black",
                "url": "/products/featherlight-tote-jet-black"
        },
        "sku": "100788BLKV1Standard",
        "title": null,
        "untranslatedTitle": null
},
"finalLinePrice": {
        "amount": 98,
        "currencyCode": "USD"
```


**Figure 11:** Data Sent to Criteo (Product Details)


```
"shippingAddress": null,
"subtotalPrice": {
        "amount": 98,
        "currencyCode": "USD"
},
"shippingLine": {
        "price": {
                "amount": 10,
                "currencyCode": "USD"
        }
},
"smsMarketingPhone": null,
"totalTax": {
        "amount": 9.56,
        "currencyCode": "USD"
},
"totalPrice": {
        "amount": 117.56,
        "currencyCode": "USD"
```


**Figure 12:** Data Sent to Criteo (Product Price)


```
        "an": "criteo.generic_shopify",
        "event_name": "payment_info_submitted",
        "site_type": "d",
        "emailSha256":
"2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb",
        "emailSha256Md5":
"0dbc2b87c4ab5304df847fdb861148b0de54577a7bfc90cb883756860e912ac6",
        "isHomePage": false,
        "socialCookies": {
                "fbc": null,
                "fbp": "fb.1.1756820684476.6642160083",
                "crto_fbc": null,
                "crto_fbp": null
        },
        "countryCode": "US"
}
```


**Figure 13:** Data Sent to Criteo (Hashed Email and fbp)

140. By providing Criteo access to the fbp parameter in addition to the hashed emails, Defendant enables Criteo to track consumers via their Facebook account, in addition to by their email address.

141. Defendant also enables Criteo to intercept information about whether a user's payment went through it. *See* Figure 14 (showing payment declined).


```
{
        "id": "7f21f010-1ca1-4bfe-810c-46dd35b69f7d",
        "name": "alert_displayed",
        "data": {
                "alert": {
                        "target": "cart.paymentLines[0]",
                        "value": null,
                        "type": "PAYMENT_ERROR",
                        "message": "Your card was declined. Try again or use a different payment
method."
                }
```


**Figure 14:** Data Sent to Criteo (Payment Declined)

### J. The Tracking Technologies Also Operate As Pen Registers

142. When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[34]

143. Often, third-party scripts are installed on websites "for advertising purposes."[35] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[36]

144. Defendant incorporates the Third Parties' Tracking Technologies' code into the code of its Website, including when Plaintiffs and Class Members visited the Website. Thus, when Plaintiffs and Class Members visited the Website, Defendant caused the Tracker to be installed on Plaintiffs' and Class Members' browsers. This allowed the Third Parties—through their respective Technologies—to collect Plaintiffs' and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

145. The Tracking Technologies also cause additional data points to be sent from

---

[34] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[35] *Id.*

[36] *Id.*

Plaintiffs' and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers including the c_user, guid, cid, and auid, ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

146. Defendant and the Third Parties then use the public IP addresses, Device Metadata, and unique identifiers of the Website's visitors that are collected and sent by the Tracking Technologies, including those of Plaintiffs and Class Members, to de-anonymize Plaintiffs and Class Members, serve hyper-targeted advertisements on Plaintiffs and Class Members, and unjustly enrich themselves through this improperly collected information.

147. At no time prior to the installation and use of the Tracking Technologies on Plaintiffs' and Class Members' browsers, or prior to the use of the Tracker, did Defendant procure Plaintiffs' and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Tracking Technologies.

148. Because, as described herein, the Tracking Technologies also collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Tracking Technologies also operate as pen registers.

### K. Defendant Did Not Anonymize Consumer Data By Disclosing "Hashed" Values To Third Parties

149. The Federal Trade Commission routinely evaluates privacy representations by companies. When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing."

> Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.
>
> . . .
>
> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[37]

150. Thus, Defendant sent and Third Parties intercepted Plaintiffs and Class Members personally identifiable information regardless of whether it was hashed or plain text.

**L. Tolling**

151. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies onto the Website.

152. The Tracking Technologies are entirely invisible to a website visitor.

153. Through no fault or lack of diligence, Plaintiffs and members of the putative classes were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

154. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

155. Defendant had exclusive knowledge that the Website incorporated the Tracking Technologies and yet failed to disclose to their users, including Plaintiffs, that by purchasing items through the Website, their PII would be disclosed to Google, Meta, and Criteo.

156. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of their collection and treatment of its users PII. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII to unauthorized third parties. Accordingly, Defendant is estopped

---

[37] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

from relying on any statute of limitations.

157. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

158. The earliest that Plaintiffs, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## CLASS ALLEGATIONS

159. **Class Definition:** Plaintiffs bring this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> The **Nationwide Class** that Plaintiffs seek to represent is defined as: All individuals residing in the United States who made a purchase on the website, www.awaytravel.com, during the Class Period.
>
> The **California Subclass** that Plaintiffs seek to represent is defined as: All individuals residing in California who made a purchase on the website, www.awaytravel.com, during the Class Period.

160. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

161. The Nationwide Class and California Subclass are referred to collectively as the "Classes."

162. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

163. Plaintiffs reserve the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

164. **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and third-parties Google, Meta, and Criteo's records.

165. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA.

b. Whether Defendant's acts and practices violated CIPA § 631;

c. Whether Defendant's acts and practices violated CIPA § 632;

d. Whether Defendant's acts and practices violated CIPA § 638.51(a);

e. Whether Defendant's acts and practices violated the privacy rights of Plaintiffs and members of the California Class under the California Constitution; and

f. Whether Plaintiffs and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

166. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had their confidential electronic communications intercepted and disclosed to Third Parties.

167. **Adequacy:** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Classes they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

168. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class Member may lack

the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation Of The Electronic Communication Privacy Act, 18 U.S.C. § 2511, *et seq.* (On Behalf of the Nationwide Class)

169. Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

170. Plaintiffs bring this claim on behalf of themselves and members of the Nationwide Class.

171. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

172. The ECPA protects both the sending and the receipt of communications.

173. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

174. The transmission of Plaintiffs' sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

175. The transmission of PII between Plaintiffs and Class Members and Defendant's

Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

176. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

177. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

178. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

179. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Google used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

b. The computer codes and programs Defendant and Meta used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

c. The computer codes and programs Defendant and Criteo used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

d. Plaintiffs' and Class Members' browsers;

e. Plaintiffs' and Class Members' mobile devices;

f. Defendant's and Google' web and ad servers;

g. Defendant's and Meta's web and ad servers;

h. Defendant's and Criteo's web and ad servers;

i. The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website;

j. The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website; and

k. The plan that Defendant and Criteo carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

180. Plaintiffs' and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

181. By utilizing and embedding the tracking technologies provided by Google, Meta, and Criteo on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members in violation of 18 U.S.C. § 2511(1)(a).

182. Specifically, Defendant intercepted—in real time—Plaintiffs' and Class Members' electronic communications via the tracking technologies provided by Google, Meta, and Criteo on its website, which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' PII and sensitive and personal information to Google, Meta, and Criteo.

183. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiffs and Class Members regarding their PII, including their identities and information related to their purchase on the Website. This confidential information is then monetized for targeted advertising purposes, among other things.

184. By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to Google, Meta, and Criteo through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

185. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of

18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

186. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. For example, Defendant engaged in such conduct for unlawful and tortious purposes, including, invasion of privacy, and associating the content of Plaintiffs' and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and Class members on its Website.

187. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

188. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiffs and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

189. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

190. Plaintiffs bring this claim against Defendant individually and on behalf of the California Subclass.

191. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the

purpose of eavesdropping upon private communications . . . .” Cal. Penal Code § 630.

192. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

193. Further, a person violates § 631(a) if s/he “aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned” in the preceding paragraph. *Id.*

194. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

195. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiffs’ and Class Members’ internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiffs and Class Members

196. Defendant, when aiding and assisting the Third Parties’ wiretapping and eavesdropping, intended to help the Google, Meta, and Criteo learn some meaning of the content in the URLs and the content the visitor requested.

197. The following items constitute “machine[s], instrument[s], or contrivance[s]” under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of “any other manner”:

a. The computer codes and programs the Third Parties used to track Plaintiffs and Class Members’ communications while they were navigating

www.awaytravel.com;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing and mobile devices;

d. Google's web and ad servers;

e. Meta's web and ad servers;

f. Criteo's web and ad servers;

g. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiffs' and Class Members' communications while they were using a web browser to access or navigate www.awaytravel.com;

h. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a browser to visit www.awaytravel.com; and

i. The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to visit www.awaytravel.com.

198. The information that Defendant transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

199. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.awaytravel.com without their consent.

200. As a result of the above violations, Defendant is liable to Plaintiffs and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.

201. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the

future.

**<u>COUNT III</u>**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

202. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

203. Plaintiffs bring this claim against Defendant individually and on behalf of the California Subclass.

204. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication..

205. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

206. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

207. Plaintiffs and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiffs and Class Members did not expect third parties, and specifically Meta, Google and Criteo, to secretly eavesdrop upon or record this information and their communications.

208. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

209. By contemporaneously intercepting and recording Plaintiffs' and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

210. At no time did Plaintiffs or Class members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

211. The Third Parties utilized Plaintiffs' and Class members' personally identifiable information for their own purposes, including advertising and analytics.

212. Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Google, Meta, and Criteo).

213. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

214. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

215. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

216. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

217. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

218. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

219. The Tracking Technologies are "pen registers" because they are a "device or process" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiffs' and Class Members' computers or smartphones. Cal. Penal Code § 638.50(b); *see*

*also Lesh*, 767 F. Supp. 3d at 40–42.

220. Likewise, the Tracking Technologies are "pen registers" because they are a "device or process" that is being used to ascertain the identity of visitors to Defendant's Website and are thus capturing "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

221. At all relevant times, Defendant installed the Tracking Technologies—which are pen registers—on Plaintiffs' and Class Members' browsers, which allowed the Third Parties to record or decode Plaintiffs' and Class Members' IP addresses and Device Metadata. The Tracking Technologies also set unique user identifiers on Plaintiffs' and Class Members' browsers so the Third Parties—here, Google and Meta could deanonymize Plaintiffs and Class Members and track them across multiple Website sessions and multiple websites.

222. Defendant and the Third Parties used the information collected by the Tracking Technologies to:

(a) identify Plaintiffs and Class Members and either create new profiles of them in the Third Parties' respective databases and/or to match Plaintiffs and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(b) sell Plaintiffs' and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Tracking Technologies on the Website and the information contained on any profiles of Plaintiffs and Class Members (which are linked to Plaintiffs and Class Members via the information collected by the Third Parties on the Website);

(c) actually target Plaintiffs and Class Members with advertisements and serve advertisements on Plaintiffs and Class Members based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiffs and Class Members (which are linked to Plaintiffs and Class Members via the information intercepted, collected, and disclosed by the Third Parties on the Website); and

(d) deanonymize Plaintiffs and Class Members and generate revenue from the sale of Plaintiffs' and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and Third Parties' revenue and the value of Third Parties' services.

223. The Tracking Technologies collect both contents and recording information relating to Plaintiffs' and Class Members' electronic communications with the Website. *In re Zynga Privacy Litig*., 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

224. Plaintiffs and Class Members did not provide their prior consent for Defendant's installation or use of the Tracking Technologies. Nor did Defendant obtain a court order to install or use the Tracking Technologies.

225. Pursuant to Cal. Penal Code § 637.2(a), Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT V
**Invasion of Privacy Under California's Constitution**
**(On Behalf of the California Subclass)**

226. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

227. Plaintiffs bring this claim against Defendant individually and on behalf of the California Subclass.

228. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiffs' and Class Members' knowledge or consent.

229. At all relevant times, by using the Tracking Technologies to record and

communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

230. Plaintiffs and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.awaytravel.com .

231. Plaintiffs and Class Members did not authorize Defendant to record and transmit Plaintiffs' and Class Members' sensitive confidential online communications.

232. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications. Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendant promised to keep Plaintiffs and Members of the California Subclass's communications confidential.

233. Accordingly, Plaintiffs and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiffs as the representatives of the putative Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury for any and all issues in this action so triable of right.

Dated: February 19, 2026.

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiffs*